# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Kent Fiebelkorn,

                              Plaintiff,

                                          Civ. No. 09-143 (RHK/SRN)
                                          **MEMORANDUM OPINION AND
                                          ORDER**

v.

IKON Office Solutions, Inc.,

                              Defendant.

---

Jason E. Engkjer, Jill A. James, James R. Crassweller, Kalina, Wills, Gisvold & Clark, P.L.L.P., Minneapolis, Minnesota, for Plaintiff.

Gina K. Janeiro, Jackson Lewis LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

This case, at its core, concerns the alleged failure by Defendant IKON Office Solutions, Inc. ("IKON") to pay commissions to a former employee, Plaintiff Kent Fiebelkorn. Fiebelkorn has asserted eight claims against IKON, four sounding in quasi-contract and four alleging violations of various Minnesota statutes. IKON has counterclaimed, seeking to recover purported overpayments of commissions and alleging that Fiebelkorn has failed to return its confidential and proprietary information. IKON now moves for summary judgment on each of Fiebelkorn's claims, while Fiebelkorn has cross-moved for summary judgment on certain of his claims and all of IKON's counterclaims. For the reasons set forth below, the Court will grant IKON's Motion in

part and deny it in part and deny Fiebelkorn's Motion.

**BACKGROUND**

Most of the relevant facts are undisputed. Accordingly, the background is recited herein without citations to the record, except where a fact is in dispute.

IKON is a multi-national dealer of copy machines and office equipment. Fiebelkorn worked for IKON as a sales representative beginning in January 2004. In June 2007, he accepted a newly created position called "Major Account Executive-Graphic Arts." In this position, he earned an annual salary plus commissions for sales he produced. The commission on each sale hinged on several factors, including *inter alia* its terms and the type of equipment sold.

Fiebelkorn's commission structure was set forth in a document entitled the "FY 2008 Compensation Plan for Major Account Executives Graphic Arts" (the "Plan"). The Plan is, charitably speaking, a complicated document that awards commissions using a confusing calculation system. Four portions of the Plan are most relevant here.

First, the Plan provides that a sales representative is not entitled to a commission until after equipment has been delivered to the customer, installed, and the customer is invoiced for the purchase. Second, the Plan provides that a sales representative must be employed on the date the customer is invoiced to be entitled to a commission. Third, the Plan permits changes to be made to the commission earned on a sale, but only with "approv[al] in writing or via electronic approval by the Area VP with copies to the Region Director of Sales and [IKON's] Commissions Administration Department."

<u>Fourth</u>, the Plan permits IKON to adjust and "charge back" a commission paid to a sales representative if it "ha[s] not been earned under the terms and conditions of" the Plan.

On March 19, 2008, IKON terminated Fiebelkorn's employment because he did not have a valid driver's license. He was informed of his termination at a meeting attended by Cindy Marty, his direct supervisor; Bobby Wray, Marty's boss and an IKON Area Vice President for the Minnesota/Iowa area; and Michael Haber, a representative from IKON's human-resources department. At the time of his termination, Fiebelkorn had not received commissions for at least two sales that had already been completed and invoiced.[1] In addition, he had several other sales not yet finalized but nearing completion. He demanded that he receive commissions for those other sales, which were "in the pipeline." (Fiebelkorn Aff. ¶ 13; Second Fiebelkorn Aff. ¶ 8; Fiebelkorn Dep. Tr. at 124-25.)[2] Wray discussed those pending sales with him and promised to pay commissions on the "pipeline" accounts as long as he helped transition them to other IKON representatives, to ensure that the business was not taken elsewhere. (Fiebelkorn Dep. Tr. at 124-25, 210; Second Fiebelkorn Aff. ¶ 10; Marty Dep. Tr. at 61-64.) Fiebelkorn did as promised and took steps to transition these accounts, including placing telephone calls to certain customers and accompanying IKON employee Brian Balow on a sales visit to

---

[1] IKON paid salary and commissions bi-weekly.

[2] The word "pipeline" is a term of art at IKON, referring to customers in different stages of the sales process. (Balow Dep. Tr. at 57.) On the date his employment was terminated, Fiebelkorn's "pipeline" accounts (1) had already had equipment installed but had not yet been invoiced or (2) were in "phase 3," the final stage of the "pipeline" in which a sale would be completed within 30 days. (Second Fiebelkorn Aff. ¶ 11; Balow Dep. Tr. at 57.)

another. (Second Fiebelkorn Aff. ¶¶ 12-17.) Ultimately, at least two of these "pipeline" accounts – Absolute Print Graphics and ServicePrinters – completed their purchases and were invoiced by IKON after March 19, 2009, Fiebelkorn's last day of employment.

On March 25, 2008, Fiebelkorn emailed Wray asking when he would receive his final paycheck, including pay for "the deals that are in the works." After Wray did not respond, Fiebelkorn re-sent his email on March 27, 2008. Wray sent a terse reply, asking Fiebelkorn to "call [him] on Monday." The next day, a regularly scheduled pay day, IKON issued Fiebelkorn a check for his earned salary, vacation pay, and commissions on certain sales that were invoiced before his employment ended, but not any of the "pipeline" deals.

Fiebelkorn emailed Wray again on April 7, 2008, asking for his year-to-date sales numbers. Wray did not respond. Fiebelkorn sent Wray another email on April 10, 2008, requesting an accounting of his commissions due. The following day (another regularly scheduled pay day), IKON issued Fiebelkorn a check for additional commissions, but yet again only for sales invoiced before his employment ended.

On April 15, 2008, Haber emailed Fiebelkorn. Attached to his email was a document styled "Agreement and Release," in which IKON agreed to pay Fiebelkorn $6,379 in exchange for a release of any claims he might have against the company. The Agreement and Release noted that "a dispute ha[d] arisen between the Parties." Haber asked Fiebelkorn to execute the document to "resolv[e] any/all outstanding commission issues."

4

Fiebelkorn refused to sign. Instead, he emailed Wray and Haber, questioning why he had been sent "legal documentation" and further questioning why IKON was "calling this a dispute." He stated that without any of the information he had been repeatedly requesting from Wray, he could not tell whether $6,379 was a valid calculation of the commissions he was owed. He again asked IKON to pay him the commissions "committed to" by Wray for his pipeline deals. He received no response. He re-sent the email on April 22, 2008, asking for resolution of the matter by April 25, 2008. Again, IKON did not respond.

Over the ensuing months, Fiebelkorn continued contacting IKON demanding his commission payments, although the exact extent of his efforts is unclear. He heard nothing until November 14, 2008, when he received a letter from Kim Castagnetta, who had replaced Wray as IKON's Area Vice President for Minnesota/Iowa. Her letter stated:

> Dear Mr. Fiebelkorn:
>
> Pursuant to our ongoing discussions with you, we have conferred with IKON's commissions group to verify your unpaid commissions.
>
> To that end, enclosed please find a check for $3,033.01 for qualifying sales prior to your termination from the company. This payment includes $2932.22 commissions and $100.79 compound interest at the rate of 6% and is made in accordance with IKON's commission plan.

Enclosed with the letter was a check for $1,853.17. No explanation how IKON had calculated that amount or, more importantly, what sales were included therein was

provided in the letter.[3]

Fiebelkorn, through counsel, returned the check to IKON and then commenced the instant action. In his Complaint, he asserts eight claims against IKON, which can be grouped into two categories: quasi-contract and Minnesota statute. In the former, he asserts claims for unjust enrichment (Count III), quantum meruit (Count IV), promissory estoppel (Count V), and implied contract in fact (Count VI) due to IKON's failure to pay commissions on the "pipeline" deals. In the latter, he asserts that IKON's conduct violated several state employment laws, namely, Minnesota Statutes Sections 181.03 (Count I), 181.13 (Count II), 181.032 and 177.30 (Count VII), and 181.961 (Count VIII). IKON answered the Complaint and asserted three counterclaims; it alleges that it overpaid Fiebelkorn commissions in connection with a December 2007 sale but, despite demand, he refuses to return the overpayment. It asserts claims for breach of contract (Counterclaim I) and conversion (Counterclaim II) as a result. In a separate breach-of-contract claim (Counterclaim III), IKON alleges that Fiebelkorn breached a Confidentiality Agreement by retaining its confidential information.

Fiebelkorn now moves for summary judgment on three of his statutory claims – Count I, Count II, and Count VII – as well as all of the Counterclaims. IKON has cross-

---

[3] By referring to commissions for "qualifying sales prior to [his] termination from the company," the letter suggests that IKON owed Fiebelkorn commissions for sales completed *before* his employment ended. Yet, there also exists evidence in the record that the letter concerned commissions for sales completed *after* his employment ended. (See Second Schwartz Aff. ¶ 11 ("IKON tendered [this] payment [for] the amount *he could have earned on the sales invoiced after his termination had he been an employee in good standing at that time*.") (emphasis added).) This ambiguity takes on greater significance later in this Opinion.

moved for summary judgment on all eight of Fiebelkorn's claims.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified.  When considering the defendant's motion, the Court views the record in the light most favorable to the plaintiff, and when considering the plaintiff's motion, the Court views the record in the light most favorable to the defendant. Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404 (7th Cir. 2002).  "Either way, summary judgment is proper if the record demonstrates that

there is no genuine issue as to any material fact." Id.

**ANALYSIS**

I.      **The quasi-contract claims**

As noted above, Fiebelkorn has asserted four quasi-contract claims (Counts III, IV, V, and VI) in his Complaint. IKON attacks these claims on several grounds but makes two overarching arguments as to all: (1) they are barred because an express contract (the Plan) governs the payment of commissions, and (2) Wray's promise was insufficiently definite to permit recovery. (See Def. Reply at 3-5, 8-9.) IKON is only partially correct.

A.      **The existence of the Plan bars the quasi-contract claims only in part**

IKON first argues that the quasi-contract claims are barred because the Plan, a written agreement between the parties, governs the payment of commissions. To analyze this argument, it is necessary to review the allegations in the Complaint to fully understand what is – and what is not – at issue in this case.

The thrust of the Complaint is that Wray (on behalf of IKON) promised to pay Fiebelkorn commissions on his pipeline deals, but IKON failed to carry out that promise. In other words, Fiebelkorn contends that IKON failed to pay commissions on sales completed *after* his employment ended. As discovery progressed in this case, however, Fiebelkorn's claims expanded. He now contends that IKON owes commissions on post-termination sales *and* underpaid commissions on sales closed *before* his employment ended. (See Fiebelkorn Aff. ¶¶ 30-34.) Yet such commissions, which were earned during Fiebelkorn's tenure with the company, indisputably were governed by the Plan. In other

8

words, to the extent Fiebelkorn claims that commissions were wrongly calculated and he was underpaid during his employment, he had only one option: sue for breach of the Plan. He has not done so. While he makes a fleeting reference to having "earned unpaid IKON commissions" on the date his employment was terminated (Compl. ¶ 21), there is no breach-of-contract claim to be found in the Complaint.

This distinction matters. Insofar as Fiebelkorn seeks additional compensation for commissions earned *before* his employment ended, those commissions were governed by the Plan and, hence, can be recovered only through a breach-of-contract claim. Quasi-contract claims do not fit the bill because, "[w]here an express contract exists, there can be no [quasi-]contract [recovery] with respect to the same subject matter." Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 (8th Cir. 1995) (applying Minnesota law).[4] Accordingly, the Court need not wade into the parties' lengthy arguments concerning the so-called underpayments – they simply cannot be recovered under the claims advanced in the Complaint. Only commissions on sales completed after March 19, 2009, may be recovered via those claims.

Quasi-contract claims for *those* commissions, however, are not barred by the existence of the Plan. IKON's argument to the contrary ignores the sequence of events

---

[4] As the Court is sitting in diversity, it must apply Minnesota's choice-of-law rules to determine what law governs Fiebelkorn's common-law claims against IKON, an Ohio corporation with a principal place of business in Pennsylvania. E.g., Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir. 1995). However, Minnesota law applies by default because neither party argues that any other state's law applies. BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003).

giving rise to such claims.  While there is no dispute that commissions earned during

Fiebelkorn's tenure were governed by the Plan, nothing in the record indicates that the

Plan's terms continued to apply after his employment ended.  That is, once IKON fired

him, the Plan ceased to govern the relationship between the parties and, hence, it was no

longer an "express contract" governing the "subject matter" of commissions.  Id.  Indeed,

this necessarily flows from the fact that the Plan applies only to IKON sales

representatives – once Fiebelkorn stopped being a sales representative, the Plan no longer

covered him.  Accordingly, Wray's *subsequent* promise to pay commissions is separately

enforceable and not barred by the Plan.  See, e.g., Slidell, Inc. v. Millennium Inorganic

Chems., Inc., Civ. No. 02-213, 2004 WL 1447921, at *18 (D. Minn. June 28, 2004)

(Tunheim, J.) (quantum-meruit claim not precluded by existence of contract where

plaintiff sought recovery for work outside contract's scope); Midwest Great Dane

Trailers, Inc. v. Great Dane Ltd. P'ship, 977 F. Supp. 1386, 1391 (D. Minn. 1997) (Alsop,

J.) (promissory-estoppel claim predicated on agreement "separate and distinct" from

parties' written contract not barred); see also ABC Elec., Inc. v. Neb. Beef, Ltd., 249 F.3d

762, 765 (8th Cir. 2001) (applying Nebraska law) ("A party may not recover under

quantum meruit for work it was obligated to perform under an express contract.

However, a quantum meruit claim may supplement an express contract by seeking

reasonable compensation for work not covered by the contract."); S&J Transp. & Storage

v. Nelson, No. C6-99-842, 1999 WL 1138522, at *6 (Minn. Ct. App. Dec. 14, 1999)

(Davies, J., dissenting) (dismissal of promissory-estoppel claim due to existence of

contract improper where claim was "based on a promise allegedly made subsequent to and independent of the" contract).[5]

A hypothetical renders this result clearer. Suppose that Fiebelkorn was working with a client for two months prior to his termination. Suppose further that on March 18, 2008 (the day before his termination), the client told him that it intended to complete a purchase shortly, once it had secured financing for the purchase. Lastly, suppose that on September 19, 2008, six months after Fiebelkorn's employment ended, the client finally obtained its financing and called IKON to complete the sale, but upon learning that Fiebelkorn was no longer employed there, decided not to complete the transaction. If, under these circumstances, Wray then asked Fiebelkorn to contact the client to persuade it to complete the sale (with another sales representative) and, in return, promised him a commission for his efforts, the Court would have little trouble concluding that he would be entitled to recover. Yet, under IKON's logic here, such a commission would be barred under the terms of the Plan, because Fiebelkorn was not employed on the date the sale

---

[5] IKON repeatedly asserts that Wray's (alleged) promise to pay commissions is "inadmissible hearsay." (Def. Mem. at 10; accord Def. Reply at 4.) Notably, however, IKON has not submitted any evidence from Wray – through affidavit, deposition testimony, or otherwise – disputing the alleged promise, and it acknowledged at oral argument that he remains employed by the company. Regardless, IKON is incorrect that the promise is hearsay. A statement constituting a "verbal act" – that is, a statement that "itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights" – falls outside the hearsay rule. Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992) (citing Fed. R. Evid. 801(c) advisory committee's note). "A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." Id. Hence, "various communications – e.g., conversations, letters and telegrams – relevant to the making of a contract are also not hearsay." Id. (emphasis added).

was completed. There is no material difference between this hypothetical and the facts of this case, and the Court believes that the outcome in each instance should be the same.

For these reasons, the Court concludes that the quasi-contract claims must be dismissed, but only to the extent they seek to recover underpaid commissions earned during Fiebelkorn's employment, and not commissions on sales completed after his tenure with the company ended.

### B.      There exists evidence of a sufficiently definite promise

IKON next argues that Wray's "promise," assuming it was made, was insufficiently definite to be enforceable. It argues that a promise to "take care of" Fiebelkorn and "pay him out what's in the pipeline" was too "generalized" and, hence, insufficient to establish a "meeting of the minds." (Def. Mem. at 10; Def. Reply at 4.) The Court disagrees.

Fiebelkorn has proffered evidence that the phrase "in the pipeline" was a term of art with a specific meaning at IKON – those accounts with sales in the final stages of completion. Moreover, the evidence establishes that Wray and Fiebelkorn discussed which specific accounts were in the pipeline at the time of Wray's promise. (See Fiebelkorn Dep. Tr. at 124-25; Marty Dep. Tr. at 61-64.) Fiebelkorn did as asked and took steps to transition those accounts – steps he was unlikely to take for the company that just fired him absent some promise from Wray. These facts undermine the argument that Wray's promise to pay commissions on pipeline accounts was indefinite or ill-

defined.[6]  Furthermore, a statement "is a clear and definite promise if the promisor should reasonably expect to induce action on the part of the promisee."  Ferris v. Bodycote Lindberg Corp., Civ. No. 01-1689, 2003 WL 21517363, at *3 (D. Minn. June 30, 2003) (Frank, J.).  In the Court's view, Wray should have expected Fiebelkorn would rely on his promise to pay commissions in exchange for helping transition his accounts to other IKON sales representatives.

At his deposition, Fiebelkorn testified that "I don't know what, I can't speak for [Wray] other than again the deals that he, he said we'll take care of you in the pipeline and *what he was referring to I'm not going to project*, *I'm not going to tell you what, which ones and which ones not.*"  (Fiebelkorn Dep. Tr. at 126 (emphasis added).)  Seizing on this testimony, IKON argues that Fiebelkorn himself did not know what Wray's promise meant, bolstering the argument that it was too indefinite to be enforceable.  (Def. Mem. at 15.)  But Fiebelkorn's understanding (or lack thereof) is not dispositive – as IKON acknowledges, whether a promise is sufficiently definite to be enforceable must be measured *objectively*.  (See Def. Mem. at 15 (citing Hunt v. IBM Mid Am. Employees Fed. Credit Union, 384 N.W.2d 853, 857 (Minn. 1986), for the proposition that "the meaning of the words must be judged by an objective standard").)  Moreover, IKON has

---

[6] The Court fails to understand IKON's argument that a "'term of art' cannot, by its very nature, be definite and is therefore, too vague to become enforceable."  (Def. Reply at 4.)  Indeed, a "term of art" is "a word having a particular meaning in a field."  Merriam-Webster's Dictionary of Law, available at http://dictionary.reference.com/browse/term of art (last visited October 20, 2009).  And the evidence in this case shows that the "term of art" at issue – "in the pipeline" – has a definite and firm meaning at IKON.  (See supra note 2.)

distorted Fiebelkorn's testimony by ignoring the question that elicited it. He was asked,

"So you believe by Mr. Wray saying that . . . I'll pay you out what's in the pipeline, he

was going to pay you for *all deals* that you had going on at that point?" (Fiebelkorn Dep.

Tr. at 126 (emphasis added).) Fiebelkorn's response to this question does not negate the

definiteness of Wray's promise, because it addressed "all deals." In other words, the

answer did not vitiate Wray's specific and express promise to pay for the deals "in the

pipeline." (See id. ("[W]e'll take care of you in the pipeline.").) Rather, it simply stated

the obvious – that Fiebelkorn could not read Wray's mind and project which deals *outside*

the pipeline he might pay for. (See id. ("I can't speak for [Wray] other than again the

deals . . . in the pipeline.").)

Furthermore, assuming *arguendo* that the words Wray used were ambiguous, the

Court's analysis would not end. When "the constituent elements of a valid oral

agreement are not nicely etched by the words" employed by the parties, a court may still

find an implied contract exists if "the facts and conduct of the parties manifested their

true intent." Capital Warehouse Co. v. McGill-Warner-Farnham Co., 149 N.W.2d 31, 35

(Minn. 1967). Certainly, Fiebelkorn's conduct – taking steps to ensure sales were

consummated by IKON shortly after being terminated by the company – can reasonably

be viewed as manifesting an intent to act in reliance on Wray's promise. And there is

evidence in the record indicating that IKON intended to pay Fiebelkorn in exchange for

his efforts, most notably IKON's November 14, 2008 letter admitting that it owed him

unpaid commissions.[7]  Under these circumstances, the Court can imply the existence of a

contract from the parties' conduct, notwithstanding any alleged ambiguity in Wray's

statements.

Finally, even if there existed some question regarding the definiteness of Wray's

promise, that is an issue for the jury.  See Slidell, 2004 WL 1447921, at *18.

---

[7] IKON argues that the letter is inadmissible under Federal Rule of Evidence 408 because it was a settlement offer.  (See Def. Mem. in Opp'n at 13-14.)  The Court disagrees.  Rule 408 bars evidence that a party offered consideration "in compromising or attempting to compromise [a] claim."  Fed. R. Evid. 408(a).  Under no reasonable interpretation can the letter be considered an attempt to compromise a claim, notwithstanding IKON's evidence to the contrary.  It did not include a request that Fiebelkorn abandon his claims against IKON in exchange for the payment conveyed therewith; it stated simply that the payment was for "unpaid commissions." (Fiebelkorn Aff. Ex. B.)  IKON clearly knew how to ask for such a concession – it included a release with its initial offer to Fiebelkorn in April 2008.  See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 909 (2d Cir. 1997) (unconditional offer that did "not require the employee to abandon . . . his suit" not barred under Rule 408).  The April 2008 offer also stated that it was intended to "resolv[e] any/all outstanding commission issues" (id. Ex. A), language noticeably absent from the November 2008 letter.  In the Court's view, the letter was nothing more than a itemization of what IKON thought it owed Fiebelkorn.  Such a document – "even under threat of legal action" – is "not an offer in settlement or a document in settlement negotiations and hence is not excludable by force of Rule 408."  Winchester Packaging, Inc. v. Mobil Chem. Co., 14 F.3d 316, 319 (7th Cir. 1994).

## C.     IKON's other arguments lack merit

IKON raises several additional arguments targeting the quasi-contract claims individually.  Many of those arguments, however, have been laid to rest by the discussion set forth above.  For example, IKON argues that Fiebelkorn's unjust-enrichment claim fails because IKON (1) did not receive anything of value to which it was not entitled and (2) did not withhold any commissions.  (Def. Mem. at 12.)  Its argument, however, is predicated on the assertion that Fiebelkorn was not owed commissions on post-termination sales, due to the language of the Plan.  The Court has already rejected this contention in light of Wray's (alleged) promise.  IKON's argument that the promissory-estoppel claim fails because the evidence "has not established a clear and definite promise outside the . . . Plan" (Def. Mem. at 14) is flawed for similar reasons.

IKON's lone remaining argument concerns the promissory-estoppel claim.  It asserts that this claim fails because (1) Fiebelkorn did not rely on Wray's promise to his detriment and (2) justice does not require enforcing the promise.  (Def. Mem. at 16-18.)  Neither contention is persuasive.

As to the former, the detriment to which a promisee must be subjected before estoppel applies is inherently fact-specific and flexible.  <u>See</u> Restatement (Second) of Contracts § 90, cmt. b.  The Court cannot say as a matter of law that the steps taken by Fiebelkorn in reliance on Wray's promise – which included traveling with Balow on a sales call to a client – were too insubstantial to constitute detrimental reliance.  <u>See id.</u>; <u>see also</u> <u>Brenner v. Nordby</u>, 306 N.W.2d 126, 127 (Minn. 1981) (noting that estoppel

"depends on the facts of each case and ordinarily presents a question for the jury").  As for the latter, a plethora of factors must be considered in determining whether enforcing Wray's promise is necessary to prevent injustice, including the reasonableness of Fiebelkorn's reliance, deterrence, and the prevention of unjust enrichment.  E.g., Faimon v. Winona State Univ., 540 N.W.2d 879, 883 & n.2 (Minn. Ct. App. 1995).  This is a question of law for the Court.  Id.  In the Court's view, it would be unjust to permit employers to promise compensation to terminated employees in exchange for their post-termination assistance completing sales, and then not pay such compensation.  Sanctioning such conduct is fraught with the potential for abuse.

## II.     The statutory claims

IKON has moved for summary judgment on all four of Fiebelkorn's statutory claims, and Fiebelkorn has cross-moved for summary judgment on three of those claims. Each is discussed separately below.

### A.     Count I – Minn. Stat. § 181.03

In Count I, Fiebelkorn alleges that IKON violated Minnesota Statutes Section 181.03.  That statute provides, in pertinent part, that "an employer . . . may not alter the method of payment, timing of payment, or procedures for payment of commissions earned through the last day of employment after the employee has . . . been terminated if the result is to delay or reduce the amount of payment."  Minn. Stat. § 181.03, subd. 2. An employer that violates the statute "is liable in a civil action . . . for twice the amount in dispute."  Id., subd. 3.

IKON argues that Count I should be dismissed because it timely paid Fiebelkorn all of the commissions he was due. However, the evidence in the record, when viewed in the light most favorable to Fiebelkorn, belies that contention. As noted above (see supra note 3), IKON's November 14, 2008 letter, on its face, acknowledged that the company owed commissions for "qualifying sales prior to [his] termination from the company." Because IKON did not pay those commissions for nearly seven months following his termination, it deviated from its regular, bi-weekly commission-payment policy. Hence, there exists evidence from which a reasonable jury could conclude that Fiebelkorn is entitled to recover under the statute. IKON's Motion, therefore, must be denied.[8]

However, this does not automatically mean that Fiebelkorn's Motion regarding the same claim must be granted. When reviewing his Motion, the Court must view the evidence in the light most favorable to IKON. Upon doing so, the November 14, 2008 letter takes on a different meaning: it refers to commissions earned *after* Fiebelkorn's employment ended. (See supra note 3.) Yet, Section 181.03 applies only to commissions "earned through the last day of employment." Id., subd. 2. And other than the November 14, 2008 letter, Fiebelkorn has pointed to no admissible evidence establishing that IKON owed commissions earned before his employment ended. (See Pl. Mem. at 10.)[9]

---

[8] That Fiebelkorn has not precisely articulated the amount of his damages (see Def. Mem. in Opp'n at 18-20) does not require dismissal of this claim. Rather, the jury will have to decide the appropriate amount of damages to be awarded, if any, if it finds IKON liable.

[9] Fiebelkorn *does* point to the April 15, 2008 email from Haber and, as with the November 14, 2008 letter, argues that it is an admission that IKON owed him commissions. In the Court's view, however, the email falls within Rule 408(a) and may not be considered. (Cf.

Accordingly, a jury could reasonably conclude that he has not established a violation of the statute.

For these reasons, there is a genuine issue of material fact as to Count I, and each Motion will be denied as to that claim.

### B.    Count II – Minn. Stat. § 181.13

Count II alleges that IKON violated Minnesota Statutes Section 181.13. That statute provides: "When an employer . . . discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee." Minn. Stat. § 181.13(a). An employer violates the statute if it does not pay the wages and commissions owed within 24 hours after demand. Id.

IKON argues that this claim should be dismissed because it has paid Fiebelkorn all of the commissions to which he is entitled. But for the reasons discussed above, the record (when viewed in the light most favorable to Fiebelkorn) does not support that assertion. Accordingly, IKON's Motion must be denied *vis-a-vis* this claim.

As for Fiebelkorn's Motion, he argues that IKON has admitted – via the November 14, 2008 letter – that it owed commissions earned during his employment. He further argues that because he demanded those commissions at the termination meeting and was not paid within 24 hours thereof, he has established a violation of the statute. (Pl. Mem.

supra note 7.)

at 12-14.)[10]

The Court cannot grant summary judgment on Count II for the same reason it cannot grant summary judgment on Count I. When viewed in the light most favorable to IKON, the November 14, 2008 letter refers to commissions earned after his employment ended. The statute, however, is violated only when "wages or commissions *actually earned and unpaid at the time of discharge*" are not timely paid. Minn. Stat. § 181.13(a) (emphasis added).

There is a genuine issue as to what the November 14, 2008 letter means – under one interpretation Fiebelkorn can recover and under another interpretation he cannot. Both interpretations are reasonable and supported by the evidence. Accordingly, judgment as a matter of law is inappropriate.

### C.    Count VII – Minn. Stat. § 181.032[11]

Minnesota Statutes Section 181.032 requires an employer to provide an earnings statement to each of its employees at the end of each pay period. The statement must include several types of information, including the employee's name, the total amount of gross pay earned, a list of deductions from that pay, and the net amount of pay after all deductions are made. Minn. Stat. § 181.032(b).

---

[10] IKON asserts that Fiebelkorn has not proffered evidence that he demanded payment at the termination meeting (Def. Mem. in Opp'n at 20-21), but there is evidence from which a jury could conclude otherwise (see Fiebelkorn Aff. ¶ 13; Second Fiebelkorn Aff. ¶ 8).

[11] Count VII also cites Minnesota Statutes § 177.30, but Fiebelkorn has abandoned his reliance on that statute. (See Pl. Reply at 17-18.)

The Court cannot grant either party's Motion with respect to Fiebelkorn's claim under this statute. On one hand, the November 14, 2008 letter can be read as a concession that IKON owed commissions as of that date. Once again, the face of the letter states that the check tendered therewith was for "unpaid commissions." (Fiebelkorn Aff. Ex. B.) Accepting that as true, IKON has conceded that it owed Fiebelkorn "unpaid commissions" and, hence, it was obligated to comply with Section 181.032. Under such facts, the failure to provide an earnings statement when it tendered the check violated the statute.[12]

On the other hand, however, there is evidence in the record suggesting that the November 14, 2008 payment was not for "unpaid commissions," but rather was intended to settle the parties' dispute. (See Second Schwartz Decl. ¶¶ 11-12.) If a jury were to so find, then the payment would not have been "earnings" and IKON would have had no obligation to provide an earnings statement under Section 181.032.

---

[12] IKON argues that this claim is moot because it provided the requisite information during discovery in this case. (Def. Mem. at 20.) To so hold, however, would be to ignore the express language of the statute, which requires an earnings statement to be provided "at the end of [the] pay period." Minn. Stat. § 181.032(a). In other words, IKON should have provided Fiebelkorn with an earnings statement at the end of the pay period in which it determined that it owed him commissions and tendered payment to him.

### D. Count VIII – Minn. Stat. § 181.961

Finally, Fiebelkorn asserts that IKON violated Minnesota Statutes Section 181.961 when it failed to provide him with a copy of his personnel file. IKON alone seeks summary judgment on this claim, arguing that (1) the claim is moot because it provided the personnel file on January 23, 2009, and (2) Fiebelkorn lacks standing to assert the claim. (Def. Mem. at 20-21.)

First, the fact that IKON provided Fiebelkorn with his personnel file during discovery does not render this claim moot. Rather, the issue is whether IKON provided the file in the time allowed by the statute (within 7 days of a request for files located in Minnesota or 14 days of a request for files located out of state). Accordingly, the Court rejects IKON's mootness argument. (See also supra note 12.)

As for standing, IKON's argument is simply wrong. It cites Minnesota Statutes Section 181.9641 to argue that "only the Minnesota Department of Labor and Industry, through the Attorney General, has the authority to enforce violations of [Section 181.964] and there is no private right of action." (Def. Mem. at 20-21.) But Section 181.965 expressly provides that "[i]n addition to other remedies provided by law, if an employer violates a provision of section 181.960 to 181.964, *the employee may bring a civil action*." (emphasis added). Accordingly, Fiebelkorn has standing to pursue this claim.

For these reasons, the Court will deny IKON's Motion *vis-a-vis* Count VIII.

### III.    The Counterclaims

IKON has asserted three counterclaims against Fiebelkorn.  He seeks summary judgment on each.

### A.    Counterclaim I – breach of contract (the Plan)

In its first counterclaim, IKON alleges that it overpaid certain commissions Fiebelkorn earned during his tenure with the company and that he failed to return those overpayments.  IKON contends that his actions amount to a breach of the Plan.  Fiebelkorn argues that this counterclaim should be dismissed because (1) it is barred by the "voluntary payment rule" and (2) the Plan does not permit IKON to recover overpayments caused by miscalculations.  Neither contention has merit.

### 1.    The "voluntary payment rule" does not apply

The "voluntary payment rule" is a "long-standing doctrine of law, which clearly provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make [it]."  Hanson v. Tele-Communications, Inc., No. C7-00-534, 2000 WL 1376533, at *3 (Minn. Ct. App. Sept. 26, 2000); accord, e.g., Best Buy Stores, L.P. v. Developers Diversified Realty Corp., 636 F. Supp. 2d 869, 886 (D. Minn. 2009) (Doty, J.); Pettibone v. Cook County, Minn., 31 F. Supp. 881, 887 (D. Minn. 1940) (Sullivan, J.), aff'd, 120 F.2d 850 (8th Cir. 1941).  However, "payments made under a mistake of fact are not voluntary payments."  Id.; accord, e.g., Pure Oil Co. v. Tucker, 164 F.2d 945, 947-48 (8th Cir. 1947) (applying Minnesota law); Joannin v. Ogilvie, 52 N.W. 217, 217 (Minn. 1892) ("If a man chooses to give away his money, . . .

he cannot afterwards change his mind; *but it is open to him to show that he supposed the facts to be otherwise.*") (emphasis added).

Here, IKON argues that it erred when calculating Fiebelkorn's commissions and, accordingly, its payments were not voluntary. Fiebelkorn counters that because IKON possessed all of the facts necessary to accurately calculate his commissions, its mistake is irrelevant under the voluntary payment rule. The Court agrees with IKON.

As noted above, payments made under a "mistake of fact" are not voluntary. The question, then, is what is a mistake of fact? According to Black's Law Dictionary, a mistake of fact is "an unconscious ignorance or forgetfulness of a fact, past or present." Black's Law Dictionary 1001 (6th ed. 1990). A reasonable jury could conclude that IKON made a mistake of fact here. There exists evidence in the record indicating that when IKON calculated Fiebelkorn's commissions, it incorrectly credited him with a "net new accelerator" to which he was not entitled. (Schwartz Decl. ¶ 22.) It does not matter that IKON had access to all of the information necessary to calculate the commissions, because the evidence supports the conclusion that IKON unconsciously ignored (or forgot) a key fact – his ineligibility for the accelerator. Under these circumstances, the alleged overpayments would not be "voluntary" and the voluntary payment rule would not bar IKON's breach-of-contract counterclaim.

## 2.    The overpayments may be recovered under the Plan

Fiebelkorn next argues that the Plan "sets forth the specific circumstances under which IKON can attempt to chargeback a commission," but "[n]one of those circumstances exist here." (Pl. Reply at 20.) He asserts that under the Plan's terms, IKON can only recover a commission paid on a sale that "ultimately is not consummated between IKON and the customer." (Pl. Mem. at 18.) He is incorrect.

The Plan's "Charge-Back/Adjustment Policy" states, in pertinent part:

> Sales Representatives who receive Commissions . . . that were paid out but have not been earned under the terms and conditions of this . . . Plan will be subject to "Charge Back/Adjustments" in accordance with applicable state law and as set forth herein. In addition, a Sales Representative will be subject to charge-back/adjustments . . . where Credits/Commissions/Bonuses are paid on a deal that is subsequently cancelled or becomes either fully or partially unfunded or unpaid.

The plain language of this provision lays bare the flaw in Fiebelkorn's argument. While it is true IKON may recover commissions on sales that fell through, the Plan makes clear that is not the *only* reason commissions may be "charged back." This is why the sentence permitting charge backs for unconsummated deals begins with the phrase "[i]n addition." The Plan expressly permits a commission to be recovered any time it is "paid out but . . . not earned" under the Plan's terms. That is precisely what IKON alleges here – that Fiebelkorn was paid commissions in excess of that to which he was entitled under the Plan. Whether that is actually true will have to be resolved by a jury, as the parties dispute the proper method of calculating commissions under the Plan and the record is unclear which party is correct (if either).

### B.	Counterclaim II – conversion

In its second counterclaim, IKON asserts that by refusing to return the overpaid commissions, Fiebelkorn has converted those overpayments. He raises several arguments why this counterclaim should be dismissed.

First, he argues that the voluntary payment rule should bar this counterclaim for the same reason it bars the breach-of-contract counterclaim. The Court rejects that argument for the reasons set forth above. (See supra at 23-24.)

Second, he argues that there is no evidence of intent or possession, two elements necessary to conversion. He asserts that he cannot have intended to convert the overpayment because IKON never informed him of it (see Pl. Mem. at 20), but the record indicates otherwise. (See Fiebelkorn Aff. ¶ 31.) He also asserts that he does not possess the overpayment because IKON deducted it from the payment sent with the November 14, 2008 letter. (See Pl. Mem. at 20.) But Fiebelkorn indisputably rejected that payment and returned it to IKON before commencing this lawsuit. (Fiebelkorn Aff. ¶ 29.) Hence, assuming IKON overpaid him, Fiebelkorn still possesses the overpayment(s).

### C.	Counterclaim III – breach of contract (confidentiality agreement)

In its final counterclaim, IKON alleges that Fiebelkorn breached a "Confidentiality and Non-Compete Agreement" he signed as part of his employment with the company. Under that agreement, he was required to return all IKON documents to the company at the termination of his employment. (See Second Janeiro Decl. Ex. B ¶ 6.)

There is no dispute that Fiebelkorn retained certain IKON documents, including

confidential customer lists, after his employment was terminated.  (Fiebelkorn Dep. Tr. at 38, 201.)  Nevertheless, he argues that this counterclaim should be dismissed because IKON "admits that it has no discernible damages."  (Pl. Mem. at 22.)  But in Minnesota, "the invasion of a legal right imports a damage. . . . Absent proof of actual loss[,] nominal damages are recoverable for breach of contractual obligation."  Geo. Benz & Sons v. Hassie, 293 N.W. 133, 137-38 (Minn. 1940).  At a bare minimum, then, IKON is entitled to nominal damages for his breach.[13]  In any event, IKON is entitled to recover its attorneys' fees incurred in enforcing the agreement.  (See Second Janeiro Decl. Ex. B ¶ 15(b).)  Accordingly, the Court will not dismiss counterclaim III for lack of damages.

In his Reply, Fiebelkorn argues for the first time that this counterclaim is moot because he has agreed to return IKON's confidential information after this case concludes.  (Pl. Reply at 21.)  It is ironic that Fiebelkorn would make such an argument, considering that he opposed the dismissal of Count VII (regarding IKON's failure to provide an earnings statement) in the face of a nearly identical assertion.  To use his own words against him, his agreement to return IKON's confidential material "does not render the claim moot, but rather conclusively proves that [he] violated" the agreement.  (Pl. Mem. in Opp'n at 26.)

---

[13] The cases cited by Fiebelkorn (see Pl. Mem. at 22) are not to the contrary.  Those cases applied the "rule of *de minimis*" in refusing to *reverse judgments on appeal* where the plaintiffs had proved only nominal damages.  "An appellate court will not reverse where the appellant is entitled to recover only nominal damages and nothing more."  Despatch Oven Co. v. Rauenhorst, 40 N.W.2d 73, 80 (Minn. 1949).  Such a rule does not preclude the recovery of nominal damages for breach of contract or suggest that such a claim must be dismissed if the plaintiff has sustained only nominal damages.  See Hassie, 293 N.W. at 137-38.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** as follows:

1.      Plaintiff's Motion for Partial Summary Judgment (Doc. No. 32) is **DENIED**; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 30) is **GRANTED IN PART** and **DENIED IN PART**.  To the extent Counts III, IV, V, and VI seek to recover underpaid commissions earned before the termination of Plaintiff's employment, the Motion is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE**.  In all other respects, Defendant's Motion is **DENIED**.

Given the complexity of this case, the numerous factual disputes in the record, and the likely difficulty the parties will have explaining it all to a jury, "this dispute is tailor-made for a negotiated settlement."  <u>Gates v. United States</u>, 33 Fed. Cl. 9, 13 (1995).  The Court strongly urges the parties to settle this matter at the next settlement conference before Magistrate Judge Nelson (if not sooner).

Dated: October 21, 2009                          s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge